IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 1, 2024

**IN RE EMBER H., ET AL.**

**Appeal from the Juvenile Court for Knox County**
**No. 112376     Timothy E. Irwin, Judge**

---

**No. E2023-00687-COA-R3-PT**

---

This appeal concerns termination of parental rights. Maternal grandparents Chaunta C. ("Grandmother") and Thomas C. ("Petitioners," collectively) filed a petition in the Juvenile Court for Knox County ("the Juvenile Court") seeking to terminate the parental rights of Bethany U. ("Mother") to her minor children Ember H. and Erowynn H. ("the Children," collectively). After a hearing, the Juvenile Court entered an order terminating Mother's parental rights on grounds of abandonment by failure to visit, abandonment by failure to support, failure to manifest, and persistent conditions. Mother appeals, arguing among other things that Petitioners prevented her from visiting the Children. We vacate the ground of persistent conditions. However, we find, as did the Juvenile Court, that the three other grounds were proven by clear and convincing evidence. We find further by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest. We thus affirm as modified, resulting in affirmance of the termination of Mother's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed, as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Christine L. Dummer, Knoxville, Tennessee, for the appellant, Bethany U.

Julie Kuykendall, Knoxville, Tennessee, for the appellees, Chaunta C. and Thomas C.

# OPINION

## Background

Ember was born to Mother in March 2013, and Erowynn in August 2015. The Children's father is subject to a separate termination proceeding. This appeal concerns only Mother's parental rights. Mother stipulated that the Children were dependent and neglected based upon substance abuse, environmental neglect, and the Children's exposure to illegal drug use. Mother was granted supervised visitation. In June 2021, the Children entered Petitioners' custody. The Children have resided with Petitioners since 2020. On October 18, 2022, Petitioners filed a petition in the Juvenile Court seeking to terminate Mother's parental rights to the Children. Petitioners alleged against Mother the grounds of abandonment by failure to visit, abandonment by failure to support, failure to manifest, and persistent conditions.

In March 2023, the Juvenile Court heard the termination petition. At the beginning of the hearing, Mother's counsel moved orally for a continuance, saying Mother had just provided a list of witnesses and these witnesses were unavailable. The Juvenile Court denied a continuance and the hearing proceeded. Grandmother testified first. Grandmother lives in a home with her husband, the Children, and the Children's younger half-brother. The Children were doing very well in school. Grandmother testified that the parents' home was "in very bad shape" when the Children were removed from it. It was dirty, with roaches and a broken toilet. Grandmother stated that Mother was living in an apartment as of trial. Mother had lived there for about a month. Before that, Mother was homeless for a few months. Regarding visitation, Grandmother testified that Mother last visited the Children in May of 2021. Grandmother described what happened on that visit:

> We were outside on the back deck. She had came to tell -- for a visit, and she told the girls that she was pregnant. And after we were done outside, we came in and came into the kitchen, and Ember asked her why that her daddy had beat her up. And [Mother] got mad because we had chose to tell Ember what had want -- vaguely told Ember what had went on. Because she is ten and she continued to ask questions because she's smart enough to know that falling down doesn't do all of the damage that was done.
>
> ***
>
> She got mad. She started yelling. The girls ran, and she chased after them and she was yelling. Continued to yell while chasing after them. The girls

-2-

hid and she was trying to push her -- Erowynn hid behind the door, and so she went into her room. She wasn't there. She went to Ember's room. Ember was holding herself against the door, and [Mother] was leaning in on the door. And at this point I've already called 911 and told them that we need someone out there because there's a situation in the home.

Mother left before the police arrived. After this incident, Grandmother barred Mother from visiting the Children at Petitioners' home. Instead, Grandmother advised Mother that she could visit through an agency called Parent Place. However, Mother never engaged in visitation through Parent Place. She stopped visiting all together. With respect to child support, in the fall of 2020, Mother gave Grandmother $100. That was the extent of the monetary support from Mother. Grandmother testified that she did not believe Mother was capable of providing any support. Grandmother, however, clarified that while Mother did not work, nothing prevented Mother from working.

With respect to how the Children are faring in her home, Grandmother said that she attends to the Children's needs, such as with food and clothing. She stated further that she has a loving and caring relationship with the Children. When the Children were first removed, they displayed an attachment to Mother. Recently, this no longer was the case. The younger child asks when she will get to visit Mother, but the older child does not. The Children displayed fear of living with Mother.

On cross-examination by Mother's counsel, Grandmother acknowledged that she got the date of Mother's last visit wrong. Mother's last visit was in May 2022, not May 2021. Grandmother also testified that Parent Place, the agency she advised Mother to use for visitations, charges a fee. Grandmother did not offer Mother any financial help in setting up visits. Mother told Grandmother that she could not afford Parent Place. The Guardian ad Litem also questioned Grandmother. Grandmother stated that under the adjudicatory order, if visitation was done through an agency, the parents were responsible for paying for it.

Mother testified next. Mother lives in an apartment and works for Instacart and Doordash. Mother was asked several questions about her income, but she gave unclear answers. The following exchange then occurred:

THE COURT: Yeah. Get me to an answer. I mean do you get a tax statement at the end of the year of how much you've made, in a calendar year?
THE WITNESS: This is all from this calendar year.
THE COURT: Do you get a tax statement?
THE WITNESS: I will at the end of this year, yes.
THE COURT: I mean you didn't make any money in 2022?

-3-

THE WITNESS: Not from those services. I was on unemployment and then I had the baby, and I was off for a few weeks.

THE COURT: Where were you on unemployment from? Where were you working when you went on unemployment?

THE WITNESS: I was a pandemic assistance adjudicator for the State of Ohio.

THE COURT: Pandemic assistance adjudicator?

THE WITNESS: Yes, sir.

THE COURT: And you lived in Ohio.

THE WITNESS: No, sir, I worked from home in Knoxville. I was laid off because it was a -- actually a Covid job and so when Covid disappeared the job disappeared.

THE COURT: You did that in 2022?

THE WITNESS: No, 2021.

THE COURT: Okay. What did you do in 2022.

THE WITNESS: Well, I was pregnant four months of the year and I looked for a job and was unable to sustain one within my field, and financial capability and to go back wired. And then I realized I was capable for unemployment and was unable to acquire a job within the same financial means that was I skillfully capable of. I was having several medical issues, and stuck in the bed many days. Including walks, and in and out of the hospital my entire pregnancy.

Mother said that, in combination with her boyfriend's income, she was able to meet her financial needs. Asked if she had paid any child support, Mother said that she was using the money she earned to provide a safe and stable home for the Children in the hopes of getting them back. On the subject of drugs, Mother said that she does not believe marijuana is a controlled substance. Mother said that she buys marijuana and that it is "one hundred percent legal." Regarding visitation, Mother had last seen the Children in May 2022. Mother said that she has asked often to see the Children. Grandmother told her to visit the Children through Parent Place. Mother said that she filled out an application for Parent Place, but an upfront fee was required. Mother said that she was not working at the time. Mother was then asked why she had not contributed more for the Children:

Q. So you said you just recently had stable housing.
A. For the girls, yes.
Q. And these children have been out of your home for over two years. It's taken you two years to get stable housing?
A. I was in a house that they deemed unfit so I had to finish my lease and then find a new one. I lived in a camper for little while, which, you know, people do that. That didn't work out so well. And I lost a lot of things when

-4-

the physical abuse happened with my ex. I was severely injured. And then as soon as that was over I sought to find unemployment when I could not have a job that paid what my other one did. I had taken on a lot of bills and I was making twenty-four or twenty-six dollars an hour on my last job.

Q. You're making twenty-four or twenty-six dollars an hour but you can't --

THE COURT: When were you doing that? When?

THE WITNESS: That was 2021.

THE COURT: So you paid child support during that time, right?

THE WITNESS: No, I was never ordered to pay child support. I helped with --

THE COURT: Making twenty-four dollars an hour you didn't pay any support?

THE WITNESS: I was never ordered to pay.

THE COURT: You didn't give any money to your mother who is keeping your kids?

THE WITNESS: I did several times. Any time -- it was not so much physical cash, but anytime there was a holiday or they needed backpacks or school supplies, or they needed Easter outfits, Christmas outfits I was happy to provide them anything. There were several times she said, hey, they could use a new water bottle for school or this one needs a new lunch box. And I generally ordered things from Amazon and had them shipped straight to her house.

THE COURT: How much do you think it cost to raise a child nowadays?

THE WITNESS: I mean I don't have an exact number.

THE COURT: Go ahead.

Q. Do you have any proof of providing that financial support you just testified to?

A. Not with me today.

On cross-examination, Mother's counsel asked Mother about her current living situation. Photographs of Mother's residence were admitted. They showed a furnished, clean home. The residence is a two-bedroom apartment. The Children would share a room. Upon questioning by the Guardian ad Litem, Mother said that Parent Place charged fifty to one hundred dollars per visit. Mother said that she could not afford the application fee to visit the Children through Parent Place. However, Mother acknowledged that, when she was donating plasma, she earned a minimum of one thousand dollars per month.

In April 2023, the Juvenile Court entered its final order terminating Mother's parental rights to the Children. In its written termination order, the Juvenile Court found that Petitioners had proven by clear and convincing evidence the grounds of abandonment by failure to visit, abandonment by failure to support, failure to manifest, and persistent

conditions.[1]  The Juvenile Court found further, also by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interest.  In its termination order, the Juvenile Court stated as relevant:

> [Mother] moved for a continuance of the matter prior to the start of trial requesting additional time to gather witnesses to testify at trial.  [Mother] stated she had been attempting to contact several witnesses to testify on her behalf, but only informed her attorney the day before trial that she sought to bring those witnesses to testify.  Attorney for the Petitioners argued that the case should proceed forward as it has been pending since October 2022 and this child needs permanency.   [Mother's] oral Motion to Continue was denied.

## [MOTHER]
### ABANDONMENT FOR FAILURE TO VISIT

> The Court finds that [Mother] has willfully failed to seek reasonable visitation with [the Children] as defined in T.C.A. § 36-1-102(1)(A)(i) and 36-1-113(g)(1) by clear and convincing evidence.  [Mother] has not visited with the minor children since May 5, 2022.   [Mother] was exercising supervised visitation at the residence of the Petitioners but caused an incident to which law enforcement had to be called.  As a result of that incident, the mother was instructed to initiate visitation through a supervised visitation agency in accordance with the Knox County Juvenile Court's Adjudicatory Hearing Order filed on December 8, 2020.  However, the mother never engaged further visitation, and therefore, willfully failed to visit the minor children.  Upon these facts, the Court hereby finds the necessary ground for termination of [Mother's] parental rights as to these children based upon her willful failure to seek reasonable visitation.

### ABANDONMENT FOR FAILURE TO PAY SUPPORT

> The Court finds that [Mother] has abandoned [the Children] by willfully failing to pay support for four (4) consecutive months immediately preceding the filing of the Petition to terminate her parental rights.  [Mother] was employed or receiving unemployment benefits such that she could have financially supported the minor children.   [Mother] only provided token support by purchasing the minor children backpacks and Easter dresses.  The

---

[1] On appeal, Petitioners concede that the ground of persistent conditions was not proven by clear and convincing evidence and do not pursue it further.  We vacate the ground of persistent conditions.

Court therefore finds the necessary ground for termination of [Mother's] parental rights as to these children based upon abandonment for willful failure to pay support.

FAILURE TO MANIFEST

The Court finds that [Mother] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of [the Children] and placing them with [Mother] would pose a risk of substantial harm to the physical and psychological welfare of the children. [Mother] has failed to visit the minor children since May 5, 2022, and has not provided monetary support for the minor children. Given [Mother's] lack of involvement in these children's lives, placing them with [Mother] would pose a risk of substantial harm and be detrimental to the children. Further, [Mother] has not remedied or established lasting efforts to address her substance abuse or environmental neglect issues that resulted in the children being removed from [Mother's] home. Upon these facts, the Court hereby finds the necessary ground to terminate the parental rights of [Mother] because she has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of [the Children] and placing them with [Mother] would pose a risk of substantial harm to the physical and psychological welfare of the children.

***

BEST INTERESTS

The children are entitled to a safe, secure, loving, and permanent home. Based on the evidence presented, they have found such a home with the Petitioners. When considering the best interest factors for termination in T.C.A. §36-1-113(i), the Court finds they weigh in favor of termination. At the time of the filing of the Petition, [Mother] was homeless and still abusing substances. [The Children] have been in the care and custody of the Petitioners since 2020. Only one month prior to trial had [Mother] obtained [a] house to which was furnished with assistance from Angelic Ministries and included a shared room for [the Children]. [Mother] has recently made merely minor adjustments that have not shown themselves to be lasting or permanent. The Court finds [Mother] has substance abuse issues, does not have a lasting stable home environment, and any environment she would place [the Children] in would be unsafe. [Mother] has not visited or

financially supported the minor children in over six months, and therefore no relationship, meaningful or otherwise has been established. The minor children are happy, healthy, thriving children whose needs are all being met by the Petitioners. The Petitioners can care for the minor children until they reach the age of majority. The Petitioners can meet all the medical, educational, and psychological needs of the children. The Court finds the children are thriving in the Petitioner's home and that there is no reasonable expectation that [Mother] could take these children into a reasonable stable home and raise them. Therefore, the termination of [Mother's] parental rights is in the best interest of [the Children].

Mother timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Mother raises the following issues on appeal: 1) whether the Juvenile Court erred in denying Mother's oral motion for a continuance; 2) whether the Juvenile Court erred in finding the ground of abandonment by failure to visit; 3) whether the Juvenile Court erred in finding the ground of abandonment by failure to support; 4) whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody; and 5) whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors .

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

. . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

-10-

each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

On October 18, 2022, when Petitioners filed their petition, the relevant grounds for termination of parental rights were set out in statute as follows:

-11-

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; [and]

***

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2022 to May 4, 2023).

For purposes of the abandonment grounds found against Mother, "failure to visit" and "failure to support" were defined thusly:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

***

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;
(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or

of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

\*\*\*

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children; [and]

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102 (West July 1, 2022 to May 4, 2023).

We first address whether the Juvenile Court erred in denying Mother's oral motion for a continuance. A trial court's denial of a motion for a continuance is reviewed under an abuse of discretion standard. *In re A'Mari B.*, 358 S.W.3d 204, 213 (Tenn. Ct. App. 2011). In *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Tennessee Supreme Court discussed the abuse of discretion standard at length, stating:

The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the

-13-

decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d [22,] 42 [(Tenn. 2005)].

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained

in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

This Court has discussed the factors to be considered when reviewing the grant or denial of a continuance:

> The party seeking a continuance bears the burden of establishing the circumstances that justify the continuance. *Osagie v. Peakload Temp. Servs.*, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002). Decisions regarding the grant or denial of a continuance are fact-specific and "should be viewed in the context of all the circumstances existing" at the time of the request. *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). The circumstances include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id.* (footnotes omitted).

*In re Paetyn M.*, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at *5 (Tenn. Ct. App. Feb. 14, 2019), *no appl. perm. appeal filed*.

At the beginning of the hearing in the present case, the following exchange occurred between Mother's counsel and the Juvenile Court:

> THE COURT: Any preliminary matters?
> MR. STANUSZEK: Judge, I'd like to make a motion for a continuance today. My client had a list of witnesses that she intended to call today, none of which were available. She did have one witness that was available by zoom, but she's also got a list of at least four other people who were unavailable today.
> THE COURT: Well, why are they unavailable? Why didn't you subpoena them?
> MR. STANUSZEK: Well, that's a good question. I just got that list this morning.
> THE COURT: No, I can't do that.
> MR. STANUSZEK: I understand.

-15-

On appeal, Mother argues in part as follows:

Given that the termination had only been pending for a few months, and that the children are placed with relatives, there would be no adverse consequence or prejudice to the children by continuing the hearing to allow the mother to subpoena her witnesses. There would, however, be tremendous prejudice to the mother by denying her request for a continuance and in fact, there was. Her parental rights were terminated.

We observe that Tenn. Code Ann. § 36-1-113 reflects an intent that termination proceedings unfold expeditiously, unless it is determined that a child's best interest requires otherwise. *See* Tenn. Code Ann. § 36-1-113(k) ("The court shall ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child.") (West July 1, 2022 to May 4, 2023). Attaining quick permanency for children clearly is a built-in objective. However, even granting that slightly less than six months had passed relative to the filing of the petition, Mother still needed to offer a good reason for a continuance. She did not. Mother failed to timely or diligently provide counsel with a list of witnesses. We do not know from this record what significance, if any, the testimony of these witnesses would have been. While Mother says that she was prejudiced as a result of the denial of a continuance, she fails to explain how these witnesses mattered to her case or why she took so long to tell counsel about them. In short, Mother has offered no good reason for a continuance. She simply sprang a list of witnesses on counsel at the last minute. Under those circumstances, the Juvenile Court's decision to deny Mother a continuance was a reasonable exercise of its discretion. The factual basis for the Juvenile Court's decision was properly supported by evidence in the record; the Juvenile Court properly identified and applied the most appropriate legal principles applicable to the decision; and the Juvenile Court's decision was well within the range of acceptable alternative dispositions. The Juvenile Court did not abuse its discretion in denying Mother's oral motion for a continuance.

We next address whether the Juvenile Court erred in finding the ground of abandonment by failure to visit. The relevant timeframe for our analysis on this ground was June 18, 2022 through October 17, 2022. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed* ("[T]he applicable four month window for determining whether child support has been paid in the context of . . . failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed."). Mother does not contend that she visited the Children during this time. Mother instead argues that Petitioners effectively prevented her from visiting the Children during

this time. She says that Petitioners insisted on having visits at Parent Place, and she could not afford Parent Place.

Under the applicable version of Tenn. Code Ann. § 36-1-102, lack of willfulness is an affirmative defense to failure to visit and the parent's burden of proof is a preponderance of the evidence. *See* Tenn. Code Ann. § 36-1-102(1)(I). Here, Mother failed to assert lack of willfulness as an affirmative defense. Nevertheless, even if lack of willfulness was tried by implied consent, Mother failed to prove that her failure to visit the Children was not willful. Petitioners barred Mother from exercising visitation at their residence after Mother had an outburst that resulted in the police being called. After that incident, it was reasonable for Petitioners to insist on an alternative site for visits. The responsibility for this episode lies with Mother. With regard to Mother's argument that she could not afford Parent Place, the record reflects that Mother had various jobs and sources of income over the course of the case. The Juvenile Court plainly did not credit Mother's excuses for failing to visit the Children, finding that "the mother never engaged further visitation, and therefore, willfully failed to visit the minor children." After May 2022, Mother stopped visiting the Children and put in no real effort to resume visitation, whether at Parent Place or any other place. The evidence does not preponderate against the Juvenile Court's findings relative to this issue. We find, as did the Juvenile Court, that the ground of abandonment by failure to visit was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of abandonment by failure to support. Once again, the relevant timeframe for our analysis of this ground was June 18, 2022 through October 17, 2022. On this issue, Mother begins by pointing out the time she gave Grandmother $100 and money for clothes. However, that testimony relates to a time before the relevant four-month window. Mother argues further that "[g]iven the scarcity of evidence regarding Mother's financial means, and her testimony that she was bedridden for at least half of the relevant time period, there is no way to determine whether or not her support was 'token.'" On this point, the Juvenile Court found that "[Mother] only provided token support by purchasing the minor children backpacks and Easter dresses." As in the previous issue, under the applicable version of Tenn. Code Ann. § 36-1-102 and the definition of abandonment, lack of willfulness is an affirmative defense, which Mother failed to raise. However, the burden to prove that support is token remains on the petitioner even under the statute as amended. *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *18 (Tenn. Ct. App. July 21, 2021), *no appl. perm. appeal filed* ("This Court has explicitly held that while the burden to prove a lack of willfulness now falls on the parent under section 36-1-102(1)(A), the burden to prove that support is token remains on DCS as the petitioner.").

While Mother argues on appeal that there is no proof that the support she gave was token in light of her means, Mother sought to justify her failure to pay child support by

testifying that she was not under a court order to pay child support in response to a question by the Juvenile Court about whether she had paid child support. Of course, a parent's obligation to support her child is not limited to when she is ordered by a court to do so. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]") (West July 1, 2022 to May 4, 2023); *In re Makenzie L.*, No. M2014-01081-COA-R3-PT, 2015 WL 3793788, at *20 (Tenn. Ct. App. June 17, 2015), *perm. app. denied Oct. 15, 2015* ("[T]he law is clear that parents have a duty to support their children even absent a court order requiring them to do so."). Mother's answer reflects that her non-payment of child support was because she felt under no obligation to pay, not because she was unable to pay. Mother testified to having held various jobs, receiving unemployment benefits, and even earning a minimum of $1,000 per month while donating plasma. While Mother testified to having health problems in connection with her pregnancy during part of the four-month period, she did not state that she was incapacitated for the entire timespan. In addition, the Juvenile Court was not obliged to credit Mother's testimony. We also observe that Mother testified to buying marijuana. Of course, in and of itself, that is not an *ipso facto* basis for finding failure to support or any other ground. It does show, however, that Mother had disposable income to spend on herself, even as she disclaimed any duty to financially support the Children.

Finally, we agree with the Juvenile Court that the items Mother gave the Children amounted only to token support. This Court has said that in-kind gifts can sometimes constitute child support. *See In re Jayda J.*, 2021 WL 3076770, at *18. However, in this case, the evidence does not preponderate against the Juvenile Court's finding that the items Mother gave for the Children, such as backpacks and Easter dresses, were token. The Juvenile Court found that "[Mother] was employed or receiving unemployment benefits such that she could have financially supported the minor children." The evidence does not preponderate against that or any of the Juvenile Court's findings as to this issue. Backpacks and Easter dresses are good, but supporting children consists of mundane daily expenses such as food, shelter, and medicine. Given Mother's work history, her plasma donating, and her unemployment benefits, Easter dresses and backpacks were token in light of Mother's means. We find, as did the Juvenile Court, that the ground of abandonment by failure to support was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. This ground consists of two prongs. Regarding the first prong of our analysis, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). The second prong of the statute requires the court to consider whether placing the child in the person's

-18-

legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14).

Mother argues that she manifested both the ability and willingness to assume custody of the Children. Mother cites her testimony that she was soon to start a good-paying job as a paramedic and that she has a stable residence. She also notes that she has a driver's license and insurance for her car. However, the main issues of the case have not stemmed from Mother's failure to work. On the contrary, the record shows that Mother earned money in various ways throughout the custodial episode, yet she gave the Children very little and stopped visiting them all together after May 2022. "[A] lack of effort can undercut a claim of willingness." *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019), *no appl. perm. appeal filed*. By the requisite standard of clear and convincing evidence, Mother has failed to manifest a willingness to assume custody of the Children. Under *In re Neveah M.*, that is sufficient to establish the first prong of this ground. Even still, with respect to ability, the Juvenile Court found that "[Mother] has not remedied or established lasting efforts to address her substance abuse or environmental neglect issues that resulted in the children being removed from [Mother's] home." The evidence does not preponderate against that or any of the Juvenile Court's findings relative to this ground. We find by clear and convincing evidence, as did the Juvenile Court, that Mother failed to manifest either the willingness or ability to assume custody of the Children.

The second prong of this ground concerns the risk of substantial harm. Mother argues that there is "[a]bsolutely no proof" that returning the Children to her care would pose a risk of substantial harm to the Children's welfare. We disagree. When a parent is reduced to the role of a stranger, taking a child out of the home in which that child has enjoyed stability poses a risk of substantial harm to that child. *See In re Antonio J.*, 2019 WL 6312951, at *9. Here, Mother stopped visiting the Children after her May 2022 outburst. Meanwhile, the Children have achieved stability with Petitioners. The prospect of removing the Children from their stable home to return to Mother's uncertainty does not inure to the Children's well-being such that there is a risk of substantial harm. We find by clear and convincing evidence, as did the Juvenile Court, that placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. Both prongs of the ground are met. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. On October 18, 2022, when Petitioners filed their petition, the best interest factors read as follows:

-19-

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2022 to May 4, 2023).

Mother makes several arguments in support of her contention that the Juvenile Court erred in its best interest analysis, to wit: that there is no evidence that returning the Children to Mother's care or otherwise continuing the parent/child relationship would be emotionally and psychologically damaging to the Children; that Mother could not maintain a bond with the Children because Petitioners prevented her from visiting them; that the Juvenile Court made no findings, and there is a lack of evidence, as to factors (G), (H), and (I), so those factors should favor Mother; that Mother has housing, transportation, will soon be starting a good new job, has completed assessments, and has submitted proof of many

-21-

of these items; that Mother has an appropriate, furnished home for the Children; and that Mother has provided some financial support to the Children in the form of purchasing some items.

Addressing Mother's arguments in turn, we begin with the alleged lack of evidence that returning the Children to Mother would be damaging for the Children. We disagree with Mother that the record contains no such evidence. Insofar as Mother has failed to support or visit the Children, these failures reflect a lack of interest in parenting that is harmful to the Children. In contrast, the evidence is uncontroverted that Petitioners attend to the Children's daily needs. Second, Mother's costly outburst at Petitioners' home upset the visitation routine by Mother's own choice. With respect to Mother's claim that Petitioners prevented her from visiting, we have found this unavailing as Mother herself caused the visits at Petitioners' home to end. She then failed, without justification, to pursue alternative visitation sites.

With respect to a lack of evidence regarding factors (G), (H), and (I), we note that, while a trial court must consider the statutory factors, a trial court is not obliged to make findings with respect to every factor. Not every factor is relevant to a given case. Certainly, some factors in this case are irrelevant, such as those touching upon the Department of Children's Services, as this is a private party action. On the other hand, some factors may be accorded greater weight than others. Therefore, even granting Mother those factors unaddressed by the Juvenile Court, that some factors are inapplicable is not dispositive. With regard to Mother's argument that her job, housing, and transportation weigh in favor of preserving her parental rights, we emphasize that these things have not been utilized by Mother toward the Children. On the contrary, Mother failed to pay regular child support over the custodial episode even though she earned money. In other words, it was not the absence of a job that caused Mother not to pay. Mother testified that she was not under an order to pay child support, as though that were a basis for failing to pay child support. It is not. Therefore, while Mother's job, housing, and transportation are good things for her, they have not translated to regular support or visitation with the Children, and we decline to presume that Mother will take a greater interest in the Children in the future than she has so far. Regarding Mother's residence, the record contains photographs showing a clean, furnished home. That much is to Mother's credit, although she had only lived there for a month or so as of the hearing.

On the issue of child support, the record reflects that Mother has been an enterprising person, making money from a variety of jobs, benefits, and even donating plasma. Nevertheless, Mother failed to support the Children. The knickknacks Mother bought the Children were token in light of her means. On the whole, the Children are thriving in Petitioners' home. The record shows that Petitioners are providing stability for the Children, whereas with Mother, it is only a speculative possibility. Mother's main

issues in this case have stemmed from her omissions. The Juvenile Court's question to Mother at the hearing was illuminating, as was Mother's non sequitur of an answer: "THE COURT: Making twenty-four dollars an hour you didn't pay any support? THE WITNESS: I was never ordered to pay." The Juvenile Court made findings relative to the applicable and relevant best interest factors. The evidence does not preponderate against the Juvenile Court's findings relative to best interest. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

## Conclusion

We vacate the ground of persistent conditions. In all other respects, we affirm the judgment of the Juvenile Court as modified, resulting in affirmance of the termination of Mother's parental rights to the Children. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Bethany U., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE